UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY PARINELLO,

        Plaintiff,

    -vs-

BAUSCH & LOMB,

        Defendant.
_____

**No. 10-CV-6519T**

**DECISION and ORDER**

## **INTRODUCTION**

Plaintiff Anthony Parinello ("Parinello" or "Plaintiff"), represented by counsel, brings this action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 <u>et seq.</u>, and the New York State Human Rights Law, N.Y. Executive Law §§ 290 <u>et seq.</u>, against his former employer, Bausch & Lomb, Inc. ("Bausch & Lomb" or "Defendant"). Parinello claims that he was disabled due to clinical depression, and that Bausch & Lomb retaliated against him for complaining that he suffered discrimination in the workplace based upon his perceived disability. Parinello also contends that Bausch & Lomb improperly terminated him based solely upon his disability.[1]

---

[1] Plaintiff's Complaint does not allege specific causes of action under the ADA. Rather, Plaintiff alleges that his first cause of action is a "violation of the ADA." <u>See</u> Plaintiff's Complaint (Dkt #1). Plaintiff states that Defendant has engaged in unlawful employment practices in violation of the ADA §§ 102(a), 102(b), and 102(b)(5)(B), 42 U.S.C. § 121122(a) (sic), 12112(b)(1), and 12112(b)(5)(b). This allegation encompasses Plaintiff's claims of disability discrimination. It is clear, however, that Plaintiff also intends to assert a cause of action for retaliation under ADA § 503, 42 U.S.C. § 12203(a). This Court will discuss Plaintiff's claims of disability discrimination and unlawful retaliation.

Defendant now moves for summary judgment, arguing that there are no disputed issues of material fact and that Plaintiff, as a matter of law, has not established a _prima_ _facie_ case of discrimination or retaliation. Plaintiff opposes Defendant's motion contending that there are contested issues of material fact sufficient to withstand summary judgment. For the reasons set forth below, Defendant's motion for summary judgment is granted, and Plaintiff's Complaint is dismissed in its entirety.

## BACKGROUND

Since August 1987, and at all times relevant to this action, Parinello was a full-time employee of Bausch & Lomb. Before his termination in March 2009, Parinello was working as a Technician V in the Lens Machining Development Department at the Optics Center in Rochester, New York.

Prior to March of 2008, Parinello was part of a working group consisting of three technicians, including himself, and one engineer. In March of 2008, six more technicians were added to the group due to an anticipated increase in workload. This increase resulted from Bausch & Lomb's undertaking the development of a new interocular lens. Michael Clark ("Clark") was the group's manager, and the group's supervisor was Anthony LaRuffa ("LaRuffa").

In May of 2008, Parinello became a Group Coordinator for the machine room (referred to by the parties as "the Lab"), responsible for coordinating work flow with the technicians and ensuring timely

completion of machining work assignments.  However, Parinello did not have supervisory authority over the individuals in the machine room group, nor did he receive any additional compensation or benefits as a result of assuming Group Coordinator responsibilities.

When Parinello served as Group Coordinator for the Lab, he believed that the Group Coordinator for the clean room located in the same area was "terrible" at her job. Parinello Dep. at 44.  On several occasions, Parinello stated to others in the Lab that if the clean room Group Coordinator worked for him, he would fire her. Id. at 50-51.

In early August of 2008, Parinello sent an e-mail to the group manager Clark to update him on the group's progress.  In the e-mail, Parinello also included his personal assessment of the clean room's Group Coordinator.  In particular, he commented, "I think there is a need to correct this problem and replace her with someone else asap." See Declaration Peter Jones ("Jones Decl.") (Dkt #26-2), Exhibit ("Ex.") 4. Several days later, Parinello forwarded the e-mail recommending the removal of the clean room Group Coordinator to the entire work group, even though he was not responsible for the Group Coordinator's performance and did not have any supervisory responsibility over her.

On August 12, 2008, Parinello was issued an Employee Disciplinary Report and a Verbal Warning. See Jones Decl., Ex. 5.

The bases for the disciplinary report were his e-mail regarding his criticism of the clean room's Group Coordinator, along with previous verbal altercations he had had with other employees. In particular, the Verbal Warning referenced Parinello's previous verbal altercations, one in April 2008, and another in August 2008, with his two technician co-workers. In both incidents, Parinello became overly loud or shouted at his co-workers about issues over which Parinello had no supervisory control. The Verbal Warning also stated that during the previous year, Parinello had received coaching and counseling from management (specifically, Clark) that his interpersonal interactions and communications with his co-workers must improve. <u>See</u> Jones Decl., Ex. 5. Parinello testified at his deposition that Clark had counseled him regarding the need to improve his interactions with co-workers "no more than three times." Parinello Dep. at 55.

At the time the Verbal Warning was issued, Parinello did not complain that it was issued for discriminatory or retaliatory reasons. The Verbal Warning contained a section for employee comments, and Parinello signed it. He did not offer any comments disputing its fairness, however.

On August 12, 2008, Parinello voluntarily stepped down from his role as Group Coordinator for the machine room. Parinello attributed his decision to the stress of the job and to his belief that management had failed to properly address his concerns about

the quality of the work by the Group Coordinator for the clean room. Parinello did not suffer any diminution in pay as a result of his decision to step down.

Shortly thereafter, Parinello drafted an apology to the work group regarding his actions. He expressed his "deepest and most sincere apology" for his "poor and hurtful statements" and his "poor actions." Parinello Dep. at 64-65. Parinello again attributed his actions to "added stress" and his "challenges in dealing with many different work styles" that all of his co-workers possessed. Id. at 64-65.

In addition to apologizing to the work group, Parinello attended three Employee Assistance Program counseling sessions that he testified were "helpful." Parinello Dep. at 60. In September of 2008, all the technicians in the lab, including Parinello, attended an all-day Social Styles Training which covered effective ways for resolving interpersonal conflicts, as well as strategies for avoiding them. Parinello testified that the training was beneficial to him and others in the work group. Id. at 61-62.

In November of 2008, Clark advised Parinello that his performance was not meeting the expectations set forth in the Verbal Warning. Specifically, Parinello was not meeting expectations as far as treating co-workers with respect, communicating effectively, and dealing constructively with conflict. Clark informed Parinello that he was going to be placed

on the 90-day Performance Improvement Plan ("PIP"), which initially was to cover the period from November 4, 2008, to February 4, 2009.[2] The PIP specifically identified the following problematic behaviors by Parinello: public displays of disrespect (rolling his eyes and making disrespectful comments), making inappropriate e-mail comments about co-workers, engaging in aggressive communication with co-workers (raised voice, disrespectful comments, physical intimidation), being confrontational about work assignments, and intimidating others into doing things his way. See Jones Decl., Ex. 8. The PIP also noted that Parinello was overstepping his work role and responsibilities in the following ways: making derogatory comments about co-workers' actions, openly questioning and challenging actions of his co-workers, visibly demonstrating frustration with other co-workers' work styles, and observing co-workers perform their duties and reviewing their work without being given authority to do so. Id.

Clark informed Parinello that failure to meet any of the expectations in the PIP would result in further disciplinary action, up to and including termination of his employment. At the time of being placed on the PIP, Parinello did not express any disagreement about his placement on the PIP.

---

[2]
    The PIP was subsequently extended due to Parinello taking two short-term disability leaves. The first was from December 12, 2008, until January 20, 2009, for clinical depression; and the second was from February 17, 2009, until March 9, 2009, for an intestinal blockage.

On November 12, 2008, Clark met with Parinello to discuss his progress under the PIP, and noted that Parinello had had a negative interaction with a co-worker since being placed on the PIP. Parinello testified that there had been a change in protocol, and he became "frustrated" and "upset," lost "some control," and raised his voice at the co-worker. Parinello Dep. at 112-13.

The next follow-up regarding Parinello's progress on the PIP was on December 10, 2008. On the PIP, Clark noted that since the last follow-up, Parinello again demonstrated disrespectful behavior towards his co-workers. In the December 2, 2008 incident, Parinello changed a radio station without talking to all the co-workers who were listening to the radio. When the co-worker asked Parinello what he was doing, he responded by "whistling and snapping his finger at her." Parinello Dep. at 119. Parinello sent an e-mail to Clark on December 9, 2008, asking to have the "disrespectful behavior" notation removed from his PIP. In the e-mail, Parinello acknowledged that he had previously engaged in poor behavior towards his co-workers, but that with regards to the radio incident, he "was not attempting to disrupt [his co-worker] with [his] whistling and waiving [his] finger, ([he] did not snap [his] fingers), [he] did this only to get her attention." Jones Decl., Ex. 11; see Parinello Dep. at 119-22.

Also on December 10, 2008, the same day as his PIP follow-up, Parinello was diagnosed with depression for the first time.

Parinello Dep. at 146-48.  Parinello informed Clark and Bausch & Lomb's nurse about his depression sometime thereafter in December 2008.  This was the first time that anyone at Bausch & Lomb had been notified about Parinello's depression.  Shortly after being diagnosed, Parinello took a short-term disability leave of absence from December 12, 2008, through January 20, 2009.

On January 20, 2009, Parinello was released to return to work without any medical restrictions. Parinello did not tell any of his co-workers about his depression until he returned to work in January of 2009, and at that time, only a select few of his co-workers knew about it. Parinello never requested Bausch & Lomb to make any accommodation for his depression, and he did not take any additional time off to be treated for his depression.

On February 3, 2009, Parinello provided Bausch & Lomb with a written complaint addressed to Clark, LaRuffa, and Kim Joy ("Joy"), the Director of Human Resources. In the complaint, Parinello stated that since he had returned to work from his short-term disability leave, he had experienced "continued retaliation and harassment." Jones Decl., Ex. 15; see Parinello Dep. at 187-88.  He then stated that he was going to "invoke [his] rights under the FMLA ADA [sic] subject to Retaliation and Harassment," and that his "legal counsel suggest[ed] immediate actions to correct these issues and to stop the retaliation and harassment outright." Id.

The same day, Clark and LaRuffa met with Parinello to seek clarification of his harassment and retaliation allegations, which Parinello explained consisted of his not being provided with the same information as everyone else in the group, as well as not receiving a sufficient amount of work. He also stated that a co-worker's request for an apology concerning an incident on January 30, 2009, constituted harassment.

While Bausch & Lomb was investigating Parinello's February 3, 2009, complaint about allegations of harassment and retaliation, Parinello submitted another complaint on February 11, 2009. See Jones Decl., Ex. 17. Parinello stated, "I am requesting a meeting to discuss this continued harassment and retaliation. I have been only assigned to deblocking and dimensional measurements for the last 2 weeks." Id. Parinello also complained that he was not chosen to "run the Cell" in a co-worker's absence, alleging, "I have stated and will continue to state that this is degrading to me." Id.

As part of Bausch & Lomb's investigation into Parinello's February 2009 complaints, Clark asked Parinello to specify when the alleged retaliation began. Parinello responded via e-mail stating that "it probably started when [he] brought to management's attention that a co-worker was 'falsifying' company records during a 2007 clinical run." Jones Decl., Ex. 16; see Parinello Dep. at

189. At his deposition, Parinello reiterated that the retaliatory conduct began in 2007. <u>See</u> Parinello Dep. at 189-91.

In an effort to improve communications between the co-worker in question and Parinello, Clark issued specific instructions to both of them on how to communicate within the workplace. <u>See</u> Clark Decl., Ex. 4. The co-worker acknowledged the problem and signed for receipt of the instructions, but Parinello refused to do so.

On February 13, 2009, Parinello met with Clark and Joy to discuss the results of Bausch & Lomb's investigation into his complaints. During the meeting, Parinello became agitated to the point of clapping his hands at Joy and shouting at her, "Let's go." Parinello Dep. at 138. Subsequently, Parinello agreed in his sworn deposition testimony that his conduct towards Joy was not appropriate. <u>Id</u>.

After the meeting, Bausch & Lomb determined that there was no evidence of harassment or retaliation. Clark and Joy advised Parinello in person of their findings. Parinello was also provided with a written response to his complaints on February 16, 2009.

On March 13, 2009, Parinello received his 2008 Annual Review from Clark. According to Clark, Parinello was "unable to make significant positive progress in addressing some of the major areas of emphasis in his PIP and therefore is being rated Improvement Required Now for the year." Jones Decl., Ex. 13. In addition, Clark noted that Parinello needed "to make stronger effort to

improve his interactions with some co-workers in order to be an effective member of the group." Id.

Parinello did not object to his rating of "Improvement Required Now." Parinello Dep. at 128-29. Specifically, he commented on the review, "I will continue to do my job to the highest level and make sure that all my individual goals are met." Jones Decl., Ex. 13.

On March 17, 2009, Parinello contacted the Bausch & Lomb Ethics Line to lodge a complaint of retaliation. In his complaint, Parinello stated to the operator that he was being retaliated against for reporting to management what he believed was intentional falsification of clinical documents by a co-worker. See Declaration of Michael Clark ("Clark Decl.") (Dkt #26-2), Ex. 5. Parinello did not complain of disability-based discrimination, harassment, or retaliation in his complaint to the Ethics Line. Id. The Original Report created by the Ethics Line stated, "Anthony Parinello . . . stated that Michael Clark, Manager, and [a co-worker], Coordinator, have retaliated against him for having reported [the co-worker] for falsifying documents." Id.; see also Parinello Dep. at 210. Parinello stated that the retaliation against him consisted of "being written up three times and placed on PIP" and not being assigned a sufficient amount of work. Id.

Parinello's 2007 complaint regarding his co-worker's falsification of documents had been previously investigated by

Bausch & Lomb's Corporate Security Department. The investigation included a review of documents, physical inspection of work areas, and interviews with the employees assigned to the Lens Machining Development Department, as well as interviews with other employees identified by Parinello as having information relevant to his complaint. The investigation determined that in 2007, Parinello's co-worker had made some counting errors on order forms, but that a manager and a senior process engineer became involved immediately and corrected the errors. The co-worker was subjected to corrective action, including training and review of the clinical order forms to ensure that number-counting data was correct. With this as background, the Ethics Line concluded that there was no evidence of harassment or retaliation, and the outcome of their investigation was communicated to Parinello via the normal response process.

Parinello testified at his deposition that his interaction with the co-worker continued to remain problematic even after Clark issued specific instructions to both of them on communicating in the workplace. Parinello admitted that despite the instructions, he continued "to demonstrate argumentative behavior towards the co-worker during daily planning meetings." Parinello Dep. at 131-32. Specifically, Parinello testified that he had not demonstrated any of the identified approaches from the Conflict Management Plan that

was a part of his PIP or the approaches found in the specific instructions from Clark. Id.

On March 19, 2009, the co-worker with whom Parinello had had the dispute was attempting to assign Parinello some work. Parinello challenged the co-worker, who was the Group Coordinator, regarding that assignment as well as a previous assignment. LaRuffa counseled Parinello about the incident, and specifically noted that his open challenge to the Group Coordinator's authority was contrary to the expectations set forth in the PIP and 2008 Annual Review. LaRuffa claims that Parinello stormed off, stating "I have given up on that and I'm not trying anymore." Clark Decl., Ex. 5. Parinello claims that he never said that he did not care about work, nor that he was giving up and he was not trying anymore, or that he was going to try to be fired. Affidavit of Anthony Parinello ("Parinello Aff.") (Dkt #32-2); see Parinello Dep. At 220-25.

Bausch & Lomb terminated Parinello's employment effective the next day, March 20, 2009.

**PRELIMINARY MATTERS**

In an effort to avoid summary judgment, Plaintiff claims that some of the undisputed facts as submitted by the Defendant are now disputed. See Plaintiff's Response to Defendant's Local Rule 56(a) Statement of Material Facts (Dkt #32-1). Plaintiff has submitted an affidavit with his Response in Opposition to the Motion for Summary

Judgment stating, <u>inter alia</u>, that throughout the course of his employment, he "performed [his] duties in a satisfactory manner," "engaged in little to no confrontational conduct towards [his] co-workers," "treated [his] co-workers with respect and dignity," "communicated effectively with [his] co-workers," "dealt constructively with conflicts," "interacted effectively with [his] co-workers," "acted appropriately towards [his] co-workers," "never intentionally intimidated [his] co-workers," "always performed [his] job at the highest level," and "always met [his] individual goals." <u>See</u> Dkt #32-2. These statements from Plaintiff's affidavit flatly contradict Plaintiff's deposition testimony. <u>See</u>, <u>e.g.</u>, <u>Deposition Transcript of Anthony Parinello (hereinafter "Parinello Dep.")</u> at 50-56, 58-59, 63-66, 91, 93-94, 112-13, 119-22, 128, 130-32, 138, 190-91, 211. Plaintiff offers no support in the record for these conclusory statements, nor does he offer any explanation as to why the statements in his affidavit contradict his previous deposition testimony.

This Court is aware that in determining a motion for summary judgment, it may not resolve issues of credibility. However, the factual averments in Plaintiff's affidavit go far beyond simple issues of credibility. Plaintiff's flatly inconsistent and contradictory statements in the affidavit transcend credibility

concerns.[3] It is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). Rather, such affidavits are to be disregarded. Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) (citations omitted).

In attempting to contest the facts set forth in Defendant's Local Rule 56(a) Statement of Material Facts, Plaintiff cites only to his affidavit to contest nineteen of the thirty-three facts he now claims are under dispute. See Docket No. 32-1 at ¶¶ 17, 19-21, 25-27, 40-41, 45-47, 49, 94, 96, 111, 117, 122, 124-25. With regard to twelve of the remaining fourteen facts that Plaintiff claims are under dispute, he again cites to his own affidavit. The other exhibits and testimony from the record to which he cites do not effectively contradict the factual averments made by the Defendant,

---

[3] Because it is unclear whether Plaintiff's counsel acted with "subjective bad faith," this Court will not require counsel to show cause as to why sua sponte sanctions should not be imposed for counsel's gross disregard of his obligations under Rule 11(b) of the Federal Rules of Civil Procedure ("F.R.C.P."). There is absolutely nothing in the record to corroborate Plaintiff's affidavit. In fact, the affidavit is so diametrically opposed to everything found in the record, including Plaintiff's own sworn deposition testimony, that it is remarkable that an attorney in federal court would cite to it. Submitting a Local Rule 56 response that cites to a patently untrue affidavit merely to create an issue of fact where one does not actually exist is a violation of F.R.C.P. 11 (b). Such further misrepresentations by Plaintiff's counsel will not be tolerated in this Court. Attorney Woodworth is strongly advised to review his duties under F.R.C.P. Rule 11(b) and bear in mind that factual contentions *must* have evidentiary support, and that denials of factual contentions must be warranted in light of the record evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

all of which are supported by, and properly cited to, the evidence in the record. <u>See</u> Docket No. 32-1 at ¶¶ 43, 48, 86, 88, 92, 102-05, 112, 114, 127. Indeed, Defendant's support for many of the facts that Plaintiff now disputes comes directly from Plaintiff's deposition testimony.

Plaintiff is left with two genuine issues that are actually under dispute here: 1)the reason why Plaintiff noticed a decrease in his workload in 2009 and 2)whether or not Plaintiff ever asked to be fired and whether or not he ever stated to his supervisor that he had given up on the expectations set forth in his Performance Improvement Plan ("PIP") and that he was no longer trying to meet those expectations. As will be discussed in more detail below, neither of these disputed facts creates a triable issue of material fact.

## **DISCUSSION**

### I. **Summary Judgment Standard**

F.R.C.P. Rule 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). If, after considering the evidence in the light most

favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. <u>Scott</u>, 550 U.S. at 380 (citing <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587 (1986)).

It is well established that "conclusory statements, conjecture, or speculation" are insufficient to defeat a motion for summary judgment. <u>Kulak v. City of New York</u>, 88 F.3d 63, 71 (2d Cir. 1996). The non-movant cannot survive summary judgment simply by proffering "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, or presenting evidence that "is merely colorable, or is not significantly probative." <u>Savino v. City of New York</u>, 331 F.3d 63, 71 (2d Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citation omitted)). Rather, he "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250 (quoting former FED. R. CIV. P. 56(e)(2); <u>see also</u> <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998) (stating that the "non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of . . . events is not wholly fanciful").

## II.  The ADA Claim

The ADA prohibits discrimination against any "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  To state a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that (1) his employer is subject to the anti-discrimination provisions of the ADA; (2) he is disabled within the meaning of the ADA; (3) he is otherwise qualified to perform the duties of his job; and (4) an adverse employment action was taken against him because of his disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) (citations omitted).

ADA discrimination claims are subject to the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). E.g., Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). After the plaintiff establishes a prima facie case, the employer then may offer, through the introduction of admissible evidence, a legitimate non-discriminatory reason for the discharge. Id. Ultimately, the plaintiff must produce evidence and carry the burden of persuasion that the proffered reason is pretextual. Id. (citation omitted).

With regard to the first element of a prima facie case under the ADA, Bausch & Lomb does not dispute that it is subject to the

ADA's anti-discrimination provisions. With regard to the second element, Bausch & Lomb has assumed for the purposes of this motion that Parinello suffers from a disability (clinical depression) within the meaning of the statute. With regard to the next element, Bausch & Lomb acknowledges that the termination of Plaintiff's employment in March 2009 constitutes an adverse employment action. See Defendant's Memorandum of Law ("Defs' Mem.") at 10 (Dkt #. 23). Other than his termination, however, Plaintiff has not established any additional adverse employment actions, as discussed further below.

> **A. Plaintiff has failed to establish that he was subjected to any adverse employment actions before being terminated.**

Plaintiff claims that he suffered an adverse employment action when Bausch & Lomb or its employees (1) issued him a Verbal Warning on August 12, 2008; (2) placed him on the PIP; (3) reduced his work load; (4) ostracized him; and (5) showed a lack of professional respect for him. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). Generally, to be adverse, an employment action must be one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006).

The Verbal Warning that Parinello received does not constitute an adverse employment action. See Chang v. Safe Horizons, 254 F. App'x 838, 839, 2007 WL 3254414, at **1 (2d Cir. Nov. 5, 2007) (unpublished opn.) ("[O]ral and written warnings do not amount to materially adverse conduct in light of our reasoning in Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006), in which we stated that '[t]he application of the [employer's] disciplinary policies to [the employee], without more, does not constitute adverse employment action.'"). Because Bausch & Lomb issued Parinello warnings consistent with its progressive discipline policy, Parinello did not suffer a materially adverse action under the circumstances. Accordingly, Parinello has not made out a prima facie case of retaliation on these grounds. See id.

Likewise, Parinello's placement on the PIP in November of 2008, was not an adverse employment action. "Placing plaintiff on a PIP, the goal of which was to improve his performance and avoid his termination, is not an adverse employment action." Szarzynski v. Roche Laboratories, Inc., No. 07-CV-6008, 2010 WL 811445, at *8 (W.D.N.Y. Mar. 1, 2010) (citation omitted); see also Brown v. American Golf Corp., 99 F. App'x 341, 343, 2004 WL 1202012, at **2 (2d Cir. June 2, 2004) (unpublished opn.) ("Brown's claim that being placed on the Performance Improvement Plan constituted retaliation in violation of Title VII fails at the prima facie

stage because being placed on the Performance Improvement Plan was not an adverse employment action.").

Furthermore, Plaintiff's allegedly reduced workload does not suffice to constitute an adverse employment action. Courts in this Circuit consistently have held that, absent a decrease in salary or benefits or a demotion to a stigmatized or less prestigious position, a reduction in work assignments does not amount to an adverse employment action. See, e.g., Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) ("Plaintiff was not transferred, nor were his job duties changed. He merely felt that he was not working to his fullest capacity. The nature of plaintiff's responsibilities remained the same but his workload allegedly decreased. Whether this was happenstance or an intentional decision on the part of Watson Wyatt is irrelevant because a decrease in workload, without any formal demotion or reduction in pay, does not constitute an actionable adverse employment action.").

Plaintiff similarly cannot demonstrate an adverse employment action based upon his allegations that his co-workers did not want to interact with him. Being socially ostracized by one's fellow employees, without more, is not enough to constitute an adverse employment action. See, e.g., Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 385-86 (S.D.N.Y. 2002) ("The Plaintiff alleges (again generally) that he was 'harassed, shunned, and subjected to

an intimidating work environment,' which allegedly included efforts by others at Bronx–Lebanon to undermine his authority and to exclude him from meetings which he had attended in the past. The Plaintiff's generalized claims of such treatment do not create a genuine issue of material fact in view of his failure to identify any specific actions by Defendants which materially changed the terms or conditions of his employment.") (internal and other citations omitted).

Finally, Plaintiff attempts to demonstrate an adverse employment action by alleging that his Group Coordinator showed a lack of professional respect towards him. This is legally insufficient, given that Plaintiff has not shown that the Group Coordinator treated him disrespectfully based upon his membership in a protected class. Personal dislike of a employee by supervisors or co-workers, for any reason other than the employee's membership in a protected category, cannot support a prima facie case under the ADA. E.g., Duclair v. Runyon, 166 F.3d 1200, 1200, 1998 WL 852867, at *3 (2d Cir. Dec. 1, 1998) (unpublished opn.) ("Duclair has failed to meet his burden because he has submitted no evidence to demonstrate, or even to support an inference, that his race, color, or national origin influenced the Postal Service's decision to terminate him. Duclair asserts that his allegations that the supervisor who chose to terminate Duclair avoided talking and touching him and excessively scrutinized his work constitutes such

evidence, but we disagree. As Duclair himself admitted in his deposition, his supervisor (1) did not avoid contact with other blacks and Haitians, (2) was generally friendly with postal employees of all races, (3) seemed to dislike Duclair personally, and (4) never made a derogatory racial or ethnic remark.").

**B.    Plaintiff has failed to establish a causal connection between the sole adverse employment action and his disability.**

As noted above, Defendant has assumed for purposes of this motion that Plaintiff is disabled due to clinical depression. Defendant also has conceded that Plaintiff sustained one "adverse employment action", namely, his termination in March 2009. The Court accordingly turns to the question of whether Plaintiff has produced evidence that would tend to "'show that the proffered reason [for terminating him] was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.'" <u>Sista</u>, 445 F.3d at 173 (quoting <u>Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program</u>, 198 F.3d 68, 72 (2d Cir. 1999) (internal quotation marks and citations omitted in <u>Sista</u>)).

To demonstrate that Bausch & Lomb's stated reasons were merely a pretext for discriminatory animus, Parinello cites only to his

own self-serving affidavit and other conclusory statements that are unsupported by the record. He also implies that the time between the date Bausch & Lomb discovered that he suffered from depression and the date of his termination gives rise to an inference that he was fired because of his disability. Parinello is correct that "temporal proximity can demonstrate a causal nexus." <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001) (citing <u>Manoharan v. Columbia Univ.</u>, 842 F.2d 590, 593 (2d Cir. 1988)). However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." <u>Slattery</u>, 248 F.3d at 95.

Here, the record evidence shows that Parinello's diagnosis of depression occurred in December 2008, nearly four months *after* being issued a Verbal Warning in August 2008, and more than one month after being placed on the PIP in November 2008. These instances of progressive discipline pre-date both Plaintiff's depression diagnosis and Bausch & Lomb's knowledge of that diagnosis. <u>See</u> <u>Tomasino v. St. John's Univ.</u>, 476 F. App'x 923, 925, 2012 WL 1372062, at **2-3 (2d Cir. Apr. 20, 2012) (unpublished opn.) ("[B]ecause the record is replete with undisputed evidence that Defendant imposed progressive discipline against Tomasino well before September, an inference of discrimination will not arise

based solely on the [three-week] proximity between her complaint and termination.") (citation omitted).

Furthermore, during the investigation into Plaintiff's workplace complaints, Plaintiff indicated that the retaliation "started when [he] brought to management's attention that [a co-worker] was falsifying company records during a 2007 clinical run." Jones Decl., Ex. 16; see also Parinello Dep. at 189-90. Additionally, Plaintiff confirmed at his deposition that he believes that the retaliatory conduct started in 2007, see Parinello Dep. at 190-91, more than a year before even he knew of his depression. In fact, throughout his testimony, Plaintiff repeatedly stated that the alleged retaliation had been occurring over a long period of time, commencing in 2007. See Parinello Dep. at 172, 187, 189-93, 206-07. This significantly undercuts Plaintiff's claim. See Duclair, 1998 WL 852867, at *3 ("Duclair's own account of his conversation with his supervisor about the firing of his co-workers shows that Duclair was not acting on the basis of a belief that the firings were discriminatory.") (citing Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (noting that to make out a prima facie case of retaliatory discharge, a plaintiff must show, inter alia, that she had a "good faith, reasonable belief" that the employer had violated Title VII)).

The record contains abundant evidence that Parinello's termination was the ultimate product of an extensive period of progressive discipline and counseling. Where an employee's termination has been "fully accounted for by non-invidious motivations and circumstances," James v. Verizon, 792 F. Supp.2d 861, 868 (D. Md. 2011), and the employee has presented "no facts other than temporal proximity[,]" id., from which a fact-finder could infer that his disability played any role whatsoever in his dismissal, an inference of discriminatory intent does not arise. Id. (citing Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006) (citing Slattery, 248 F.3d at 95)).

Because the actions that led to Parinello's termination began before his disability became a potential issue, no reasonable fact-finder could conclude that Parinello was fired on the basis of his disability as opposed to other legitimate factors, such as his failure to conform to the requirements of the PIP and Bausch & Lomb's employment standards. Accordingly, Parinello cannot as a matter of law establish the requisite element of causation. His ADA claim must be dismissed for failure to establish a prima facie case.

## III. The Retaliation Claim

Plaintiff also claims that his employment was terminated because he made complaints to management that he was being discriminated against because of his disability. To establish a

prima facie case of retaliation under the ADA, a plaintiff must demonstrate that "(a) he 'engaged in protected activity,' (b) [his employer] was 'aware of this activity,' (c) [the employer] 'took adverse action against [him],' and (d) 'a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" Sista v. CDC Ixis North America, Inc., 445 F.3d at 177 (quoting Regional Economic Community Action Program, Inc. v. City of Middletown, 294 F.3d 35, 54 (2d Cir. 2002)). Retaliation claims under the ADA are analyzed using the McDonnell-Douglas burden-shifting framework. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases.").

A.  **Plaintiff has failed to establish a causal connection between any protected activity and any alleged adverse employment action.**

As a threshold issue, the Court must determine whether Plaintiff engaged in "protected activity" for purposes of the ADA, which is defined as "oppos[ing] any act or practice made unlawful by" the ADA, or making "a charge, testifying assist[ing in], or participat[ing] in any manner in an investigation, proceeding or hearing under the ADA. 42 U.S.C. § 12203. Plaintiff claims that he engaged in a protected activity when he filed complaints about

alleged disability discrimination at Bausch & Lomb on February 3, 2009; February 11, 2009; and March 17, 2009.

The Court agrees that the complaints Parinello made in February 2009, alleging harassment and discrimination, constitute protected activity under the ADA. However, the March 17, 2009, complaint to Bausch & Lomb's Ethics Line cannot demonstrate a protected activity under the ADA because Parinello did not assert harassment, discrimination, or retaliation based upon his depression. The record shows that the gravamen of Parinello's complaint to the Ethics Line was that a co-worker had falsified records in the fall of 2007. See Clark Decl., Ex. 5; Parinello Dep. at 210, 215. "Ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." International Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F.Supp.2d 345, 357 (S.D.N.Y. 2007) (citing, inter alia, Sales v. YM & YMHA of Washington Heights and Inwood, Nos. 00 Civ. 8641(RLC) and 01 Civ. 1796(RLC), 2003 WL 164276, at *8 (S.D.N.Y. Jan. 22, 2003) (finding complaints to an employer unaware of the racial undertones of term used by employee's supervisor were not protected activity)). The content of Parinello's March 2009 complaint to the Ethics Line, even when construed in the light most favorable to him, does not raise a genuine issue of fact as to whether Bausch & Lomb was put on notice

that Parinello believed he was being discriminated against on the basis of his depression.

However, even assuming for the sake of argument that the March 17, 2009, complaint was sufficient to give Bausch & Lomb notice that Parinello was claiming discrimination based upon his depression, the record does not permit Parinello to establish a causal connection between any of the three complaints and any alleged adverse employment actions. The only employment action that is "adverse" for purposes of the ADA is Parinello's termination, as discussed above in this Decision and Order.

As further discussed above, Parinello has not adduced any non-conclusory admissible direct evidence to establish a connection between his alleged protected activities in February 2009, and his termination on March 19, 2009. The only plausible circumstantial evidence of causation suggested by Parinello is the temporal proximity between the protected activity and the termination. This Court has already found, however, that the temporal proximity present here, standing alone, does not give rise to an inference of discrimination. The same conclusion is required in the context of Parinello's retaliation claim. <u>See</u> <u>Slattery</u>, 248 F.3d at 95 ("[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

The record is clear that Parinello was counseled on at least three separate occasions regarding his inappropriate interactions with co-workers, prior to receiving a formal Verbal Warning on August 12, 2008. Parinello received further assistance through Bausch & Lomb's Employee Assistance Program counseling. After being placed on the PIP on November 4, 2008, he had a series of meetings with Clark to review his progress on the PIP. All of these sessions yielded unsatisfactory results, despite Parinello having received ongoing coaching and feedback about how to appropriately interact with his co-workers. Most importantly, all of these events preceded any of Parinello's complaints about workplace discrimination. "Because plaintiff relies only on the temporal proximity between his complaints and his firing to establish a causal connection between the two, and because plaintiff's documented poor performance began significantly and sufficiently earlier, plaintiff cannot establish that any such causal connection existed." Mattera v. JPMorgan Chase Corp., 740 F. Supp. 2d 561, 582 (S.D.N.Y. 2010) (no inference of causation, despite temporal proximity of four months; plaintiff's "non-refuted poor performance reports began in mid-2005, a full year before he first complained of discrimination and fifteen or so months before he was terminated") (citing Slattery, 248 F.3d at 95).

Moreover, the sequence of events described by Parinello logically precludes this Court from inferring the necessary causal

connection. Parinello has repeatedly averred that the retaliatory conduct about which he complained took place in 2007, after and because of a complaint he made about a co-worker allegedly falsifying company documents, not because of his disability or any complaints he made about disability discrimination or retaliation.

**B.    Plaintiff has failed to establish any evidence demonstrating that the legitimate non-discriminatory reasons for terminating his employment are merely pretextual.**

Assuming, <u>arguendo</u>, that Plaintiff could state a <u>prima facie</u> claim of unlawful retaliation, Defendant has proffered evidence to establish that Plaintiff was terminated because he continued to demonstrate inappropriate workplace behavior, including being argumentative, raising his voice, making threatening gestures, engaging in inappropriate work interactions, failing to meet his PIP requirements, and failing to meet his 2008 Annual Review requirements.

Plaintiff has come forward with no evidence that Defendant's non-discriminatory reasons for terminating him are pretextual. Instead, Plaintiff offers his own unsubstantiated, subjective belief that the various employment actions were retaliatory. This evidence is insufficient to carry his burden under the <u>McDonnell-Douglas</u> test. <u>See</u> <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent

any concrete particulars, would necessitate a trial in all [discrimination] cases.").

In sum, there are no contested issues of material fact on any of the elements of a retaliation claim under the ADA. Plaintiff has not proffered any evidence to rebut Defendant's legitimate business reasons for terminating Plaintiff's employment. Accordingly, Plaintiff's cause of action for retaliation under the ADA fails as a matter of law.

## IV. Pendent State Law Claims

New York State's Human Rights Law defines "disability" more broadly than the ADA. E.g., Treglia v. Town of Manlius, 313 F.3d 713, 723-24 (2d Cir. 2002); Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 233 (2d Cir. 2000) (per curiam). Apart from the definition of disability, the legal standards for discrimination and retaliation claims under the Human Rights Law are analytically identical to claims brought under the ADA. Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 440 n.10 (E.D.N.Y. 2009) (citing Rogers v. New York Univ., 250 F. Supp.2d 310, 313 n. 4 (S.D.N.Y. 2002)).

Defendant does not dispute the issue of Plaintiff's disability, and has assumed for purposes of this motion that Plaintiff is disabled. Thus, the Court need not determine whether Plaintiff is disabled for purposes of New York's Human Rights Law ("H.R.L."). With regard to the remaining elements of Plaintiff's

H.R.L. claim, the analysis is essentially the same as the ADA analysis. Id. Plaintiff's H.R.L. claims fail as a matter of law for the same reasons that his ADA claims fail, as discussed above in this Decision and Order. Rogers, 250 F. Supp.2d at 313 n. 4 ("Since the legal standards for discrimination claims under the ADA and under New York state and city law are essentially the same, discussion of the federal ADA claims applies to the state law claims as well.").

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted, and Plaintiff's Complaint is dismissed in its entirety with prejudice. The Clerk of the Court is requested to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


                              S/Michael A. Telesca

                              _____
                              HONORABLE MICHAEL A. TELESCA
                              United States District Judge

Dated:     April 17, 2013
           Rochester, New York